UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | CAUSE NO. 3:23cr3 DRL |
| DEVANTE JIGGETTS, | |
| Defendant. | |

OPINION AND ORDER

The government charged Devante Jiggetts with one count of unlawfully possessing a firearm as a felon. *See* 18 U.S.C. § 922(g)(1). He was arrested the evening of November 29, 2022. The following afternoon, a federal task force officer questioned him, along with two detectives investigating a string of robberies. Mr. Jiggetts asks the court to suppress his statements during this interview under the Fifth Amendment. He says questioning occurred after he asserted his right to counsel and while he remained under the influence of marijuana and heroin. The court denies the motion.

FACTUAL FINDINGS

After briefing, the court held an evidentiary hearing on April 12, 2023.[1] *See United States v. Coleman*, 149 F.3d 674, 677 (7th Cir. 1998). These facts emerge from the evidence and testimony. *See* Fed. R. Crim. P. 12(d). Additional findings follow in the court's discussion of the arguments.

About 7:00 p.m. on November 29, 2022, Mr. Jiggetts was arrested by South Bend Police Officer Bradley Sadilek for fleeing law enforcement and possessing marijuana. Officer Sadilek declined to speak to Mr. Jiggetts after reading his *Miranda* rights because Mr. Jiggetts claimed to be "high as fuck" and to have used both marijuana and heroin.

---

[1] The government called as witnesses Task Force Officer Timothy Freel and Detective Matt Napolitan. The government introduced two exhibits: Exhibit 1 (interrogation video) and Exhibit 2 (FBI Advice of Rights form). The defense called Mr. Jiggetts to testify.

Just before 2:30 p.m. the following afternoon, November 30, 2022, Mr. Jiggetts was brought from the St. Joseph County Jail to the South Bend Police Department for questioning. Task Force Officer Timothy Freel conducted the bulk of questioning (about 90 to 95 percent of it) while two other officers, Detective Matt Napolitan and Detective Josh Brooks, participated. At this time, Mr. Jiggetts had not been charged with unlawful possession of a firearm, but TFO Freel was investigating this issue as well as a string of robberies.

TFO Freel first covered Mr. Jiggetts' rights to counsel, to appointed counsel, and to cease questioning at any time even if he decided to proceed initially without counsel. Mr. Jiggetts signed a waiver of these rights and then engaged the three law enforcement officers in dialogue. Twice during an approximate two-hour-and-twenty-minute interview, Mr. Jiggetts told officers that he had a lawyer and once identified him by name. He admitted to possessing the firearm in question.

Short of the two-hour mark, TFO Freel mentioned that law enforcement might be interested in taking the case federally. At this point, Mr. Jiggetts became more talkative and nervous and began mentioning that he was coming down from a drug high and was sleep deprived—things he had not mentioned in the interview before. The three officers shortly thereafter terminated the interview. The video captures the entirety of this interview in more detail [Ex. 1].

## DISCUSSION

The Fifth Amendment to the United States Constitution says no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "[T]he Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during custodial interrogation without a prior warning." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990) (quotations omitted). *Miranda* warnings include the right to remain silent, the right to have an attorney present, and the right to have an attorney who is retained or appointed. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The

2

government must show that the defendant voluntarily waived his rights before a custodial interrogation, else his statements must be excluded. *See United States v. Thurman*, 889 F.3d 356, 364 (7th Cir. 2018).

    A. *Request for Counsel.*

A suspect must assert his right to counsel. His Fifth Amendment right is not self-executing. *McKune v. Lile*, 536 U.S. 24, 65 n.10 (2002). He must assert his right rather than answer a question if he wishes to avoid self-incrimination. *United States v. Swanson*, 635 F.3d 995, 1001 (7th Cir. 2011).

The request for counsel must be objectively unambiguous. *See Davis v. United States*, 512 U.S. 452, 459 (1994); *see also Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010). When an accused person expresses a desire to deal with a law enforcement officer only through counsel, he is "not subject to further interrogation by the authorities until counsel has been made available to him, unless [he] initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). When, however, a reference to counsel is "ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [the law does] not require the cessation of questioning." *Davis*, 512 U.S. at 459.

Often the difficult decision is whether the suspect unequivocally requested counsel, *see United States v. Hunter*, 708 F.3d 938, 942 (7th Cir. 2013), and today that proves to be the very issue. To determine whether a suspect clearly requested counsel, the court must evaluate the "request as ordinary people would understand it, and to give a broad, rather than a narrow interpretation to a defendant's request for counsel." *Id.* (quotations omitted); *see Connecticut v. Barrett*, 479 U.S. 523, 529 (1987). This is a fact-intensive inquiry. *Hunter*, 708 F.3d at 942. The court "consider[s] the circumstances in which the statement was made as well as the words employed." *United States v. Wysinger*, 683 F.3d 784, 793-94 (7th Cir. 2012). "[S]tatements indicating a certain and present desire to consult with counsel [are] enough to invoke a defendant's right to counsel." *Hunter*, 708 F.3d at 942 (citing *Miranda*, 384 U.S. at 444-45).

3

A sampling of cases helps elucidate the difference. The statement "I want an attorney before making a deal" in the middle of a police interrogation qualifies as an unambiguous assertion of the right to counsel. *Edwards*, 451 U.S. at 479. Responding definitively to an officer's question about whether the suspect would like to have an attorney present during interrogation ("Uh, yeah I'd like to do that.") likewise qualifies. *Smith v. Illinois*, 469 U.S. 91, 97 (1984). The Fifth Amendment protects a suspect's clear inquiry, "I mean, but can I call one now? That's what I'm saying." *Wysinger*, 683 F.3d at 795-96. And similar statements—such as "I think I should call my lawyer" and "I have to get me a good lawyer, man. Can I make a phone call?"—are also unambiguous requests of the right to counsel. *United States v. Lee*, 413 F.3d 622, 626 (7th Cir. 2005).

In contrast, an ambiguous reference to counsel isn't enough. *United States v. Alt*, 58 F.4th 910, 916 (7th Cir. 2023). A defendant's statement—"real quick, on the, uh, appointed lawyer, do you have a lawyer here?"—is not an unambiguous request for counsel because it fails to reflect a certain and present desire for counsel and "suggests that [the defendant] was still undecided about whether he wanted a lawyer." *Id.* Ambiguous requests don't require an officer to cease interrogation. *See also Davis*, 512 U.S. at 455 ("Maybe I should talk to a lawyer."); *Wysinger*, 683 F.3d at 794-95 ("Do I need a lawyer before we start talking?"); *United States v. Shabaz*, 579 F.3d 815, 819 (7th Cir. 2009) ("[A]m I going to be able to get an attorney?"); *Lord v. Duckworth*, 29 F.3d 1216, 1221 (7th Cir. 1994) ("I can't afford a lawyer but is there any way I can get one?"). Officers are not required to clarify a suspect's ambiguous statement. *See Davis*, 512 U.S. at 461; *Lee*, 413 F.3d at 625.

Here, Mr. Jiggetts said, "I have a lawyer. His name is Rudy Monterrosa or something like that." He made this statement about a minute and a half into the interview as the task force officer explained the right to have a lawyer present during questioning or to stop answering at any time. Words are known by the company they keep, *see Subdiaz-Osorio v. Humphreys*, 947 F.3d 434, 444-45 (7th Cir. 2020); and, by

4

his words and within their context, Mr. Jiggetts never unambiguously requested counsel, *see Alt*, 58 F.4th at 916; *Wysinger*, 683 F.3d at 793-94. He merely noted he had one.

Indeed, within the following minute, Mr. Jiggetts acknowledged he understood his rights and "at this time [he was] willing to answer questions without a lawyer present" as he signed a waiver of his rights, and after the officer thoroughly covered the form. *See also Smith v. Illinois*, 469 U.S. 91, 95 (1984) ("if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked"). The task force officer asked him whether he was willing to talk, and Mr. Jiggetts said he didn't mind. He engaged law enforcement rather than requested his counsel to be present.

About an hour and fifty-two minutes into the interview, Mr. Jiggetts again noted he "[had] a lawyer" and that "he [could] be [his] lawyer for this [case] too," not just for a related state matter. Once more, he never requested that his counsel be present. Instead, he said, "Even if I tell you that I got a lawyer and . . . me signing anything. I know my rights, yes I do know my rights." Just after the two-hour mark, when asked whether he wanted a lawyer present for a last question, Mr. Jiggetts said, "I don't need no lawyer present for this question." Though Mr. Jiggetts expressed at that point and today that he should have had counsel, he never unambiguously requested counsel. He merely noted that counsel existed—an observation that fell well short of requesting counsel. *See United States v. Hampton*, 885 F.3d 1016, 1019-20 (7th Cir. 2018) (observation that suspect lacked counsel wasn't a request for counsel). The court denies the motion to suppress accordingly.

B. *Voluntariness of Waiver.*

A statement made "during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived [*Miranda*] rights when making the statement." *Berghuis*, 560 U.S. at 382 (quotations omitted). For a statement to be admissible post-*Miranda* warnings, a defendant must "knowing and intelligently waive[] his rights at the outset of a police

5

interview," and the defendant's statements must be voluntary when waived "in the circumstances of the interview as a whole." *United States v. Outland*, 993 F.3d 1017, 1019 (7th Cir. 2021).

This analysis "has two distinct dimensions: [the] waiver must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and [must be] made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Berghuis*, 560 U.S. at 382-83 (quotations omitted); *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The court examines the totality of the circumstances to make this judgment. *See Colorado v. Spring*, 479 U.S. 564, 573 (1987); *Collins v. Gaetz*, 612 F.3d 574, 587 (7th Cir. 2010). A waiver is voluntary if "the totality of circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension," *Moran*, 475 U.S. at 421, and not obtained "through coercive means that overcame the defendant's free will," *Outland*, 993 F.3d at 1021.

For the totality of the circumstances, the court considers all factors, including "the nature and duration of the questioning used to secure the confession, whether the defendant was prevented from eating or sleeping, and whether the defendant was under the influence of drugs or alcohol." *Watson v. Detella*, 122 F.3d 450, 453 (7th Cir. 1997). "In assessing voluntariness, courts must weigh the tactics and setting of the interrogation alongside any particular vulnerabilities of the suspect [including] the suspect's age, intelligence, and education, as well as his familiarity with the criminal justice system." *Dassey v. Dittmann*, 877 F.3d 297, 304 (7th Cir. 2017) (*en banc*). Additional factors may include "the physical circumstances of the interrogation; the manner and actions of the police in questioning [the defendant], including bluffing about what they knew and assuring him of the value of honesty; [the defendant's] resistance or receptiveness to suggestions by interrogators; and the extent to which he provided the most incriminating information in response to open-ended, non-leading questions." *Id.* at 305.

On this record, Mr. Jiggetts voluntarily waived his *Miranda* rights. TFO Freel carefully reviewed the waiver form with Mr. Jiggetts before he signed it [Ex. 2]. Although three officers filled the room,

TFO Freel conducted the interview professionally and conversationally, without threats, duress, yelling, or overt trickery. *See Thurman*, 889 F.3d at 365. The interview took less than three hours during the middle of the afternoon—not long or unusual in measure, particularly when Mr. Jiggetts from the videotape and from credible testimony at the evidentiary hearing remained engaged. *See Berghuis*, 560 U.S. at 386-87 (finding valid *Miranda* waiver when three-hour "interrogation was conducted in a standard-sized room in the middle of the afternoon"). Mr. Jiggetts answered responsively to questions throughout the interview. He was not handcuffed. No officer drew his weapon or displayed a tendency toward any force or aggression. *See United States v. Bailon*, 60 F.4th 1032, 1038-39 (7th Cir. 2023). Indeed, Mr. Jiggetts admitted the conversation was "respectful."

At age 28, Mr. Jiggetts emphasized during the interview that he was "far from slow, stupid, or dumb" and he knew that a camera was recording their conversation and "this stuff [could] be used against [him]." Though in the past he may have attended special education classes or received mental health treatment, this day he was knowledgeable of his rights and familiar with the protocols of such interviews within the criminal justice system. He wasn't vulnerable. Indeed, at the start he acted quite interested in sussing out what law enforcement officers knew and engaged them to acquire that information. The interview began just before 2:30 p.m. the day after his arrest. Although he said nearly two hours [1:49:30] into the interview that he never rested well and remained tired, he had the opportunity to rest and to eat, and nothing objectively reflected any fatigue. Officers also gave him a Pepsi during the interview, so he was not deprived of refreshment during this session.

A defendant arguing his admission was involuntary "must show that the police engaged in coercive practices." *Dassey*, 877 F.3d at 303. No such showing has been made here. Instead, Mr. Jiggetts claims that he remained intoxicated from the effects of heroin and marijuana such that he was "foggy" (to use his word in testimony) and acted involuntarily. "[I]ntoxication by itself [can] not support a finding of involuntariness and is relevant only to the extent it made [the defendant] more susceptible to mentally

7

coercive police tactics." *Anderson v. Thieret*, 903 F.2d 526, 530 n.1 (7th Cir. 1990). The court doesn't find the claimed effects of intoxication to be credible on this record, much less that his condition predisposed him to mental coercion.

Well-trained officers, including the 24-year veteran TFO Freel and 8-year Detective Matt Napolitan, testified reliably and consistently that they observed no signs of intoxication. Mr. Jiggetts was responsive to questions. He spoke coherently and intelligently. His demeanor and language during the interview, as seen on videotape, isn't indicative of someone intoxicated. According to testimony at the hearing, Mr. Jiggetts wasn't lethargic or slurring his speech. His eyes weren't bloodshot or glassy.[2] He showed no signs of nausea, and he drank some of his Pepsi—not likely something one would do if he were nauseated. He wasn't sweating. He exhibited no signs of physical distress or influence. There were no reports of detoxication measures at the jail from the time he was arrested at 7:00 p.m. the night before until the interview the following afternoon at just before 2:30 p.m.

From all accounts of the officers, who are trained to note intoxicated behavior, everything seemed normal. Any fidgeting or restlessness seems characteristic of Mr. Jiggetts, or the circumstances of being interviewed about potential crimes, not characteristic of his intoxication. Indeed, Mr. Jiggetts acted little different testifying on the stand at this suppression hearing (once more admitting he was anxious) than he did during the police interrogation, and there were no indications he was high during the hearing. As a comparative baseline, this underscores the court's interpretation of any jitteriness during the interview as reasonably typical of Mr. Jiggetts in such circumstances. Indeed, he testified he naturally cannot sit still.

Mr. Jiggetts may well have been intoxicated the night before, as one officer (South Bend Police Officer Bradley Sadilek) said he was concerned about Mr. Jiggetts' state of mind at that time of his arrest. The interview occurred over 19 hours later and not under circumstances that any lingering remnants of drugs in his system made the police interrogation more effective. *Anderson*, 903 F.2d at 530-31

---

[2] TFO Freel made a point of even noting Mr. Jiggetts' colored contacts during the interview.

(impairment unlikely when approximately 19 hours had elapsed between the defendant's last alcoholic drink and his confession); *see also United States v. Montgomery*, 14 F.3d 1189, 1195 (7th Cir. 1994) (diminished mental state due to alcohol or drugs is relevant to voluntariness only if it made police coercion more effective). Mr. Jiggetts had not been booked at the jail in any medical pod, nor received any detoxication care, suggesting that the effects of his heroin and marijuana use had not been so potent.

The court finds Mr. Jiggetts' testimony about the precise sequence of events, and in particular his drug use, as less than credible. He said he was depressed from a sister and cousin having passed. He went to Kroger to buy taco meat, salad, and wine to take to his girlfriend's house to make dinner. He testified that he was at Kroger for approximately one hour.[3] He was pulled over thereafter. He said he smoked four blunts of marijuana two hours before going to the grocery store. That would mean that he smoked marijuana around 4:00 p.m. Despite this clear testimony, Mr. Jiggetts revised his statement later and claimed that he smoked marijuana the last time around 6:00 or 6:45 p.m. (thus just before his arrest) on November 29. His revisionary testimony cuts against his credibility.

Still, either way, whether over 22 hours before his interview, or over 19 hours before his interview, he would not likely still be experiencing the effects of marijuana mid-afternoon on November 30 or in such a way as to make the questioning more effective. *See* Harvard Med. Sch., *Marijuana and Heart Health: What You Need to Know*, Harvard Health Publ. (Jan. 19, 2022) ("impact of smoked or inhaled marijuana is generally felt within a few minutes and lasts two to four hours"); Nat'l Inst. on Drug Abuse, *Cannabis (Marijuana) DrugFacts* (Dec. 2019) ("Marijuana raises heart rate for up to 3 hours after smoking."); *see generally* Ctrs. for Disease Control & Prevention, *Marijuana and Public Health: Brain Health* (Oct. 19, 2020)

---

[3] He testified 65 minutes, and then later guessed that counsel's suggestion of 45 minutes might be right.

9

(noting immediate impact of marijuana use on "thinking, attention, memory, coordination, movement, and time perception").[4]

Mr. Jiggetts testified that he used heroin for the first time on November 29, 2022, though his method suggests more familiarity. He "tooted" the drug by pitting it in his fingernail and sniffing it through his nostril. He thought the drug would help his depression, but he found that it enhanced his frustration and caused his heart to race. Reasonably then, one would have stopped, but incredibly he said he continued. After being booked at the St. Joseph County Jail and placed in a side cell (not a medical pod), he said he took another hit of heroin. Though it would not be the first time a suspect has been incarcerated with a secreted drug, his claim that he kept this hit within his mouth the entire time of his arrest, search, transportation, booking, and early start of his detention is altogether incredible—and seemingly new information to all those participating in this evidentiary hearing. He says he used this "little left" at approximately 6:00 a.m. on November 30. Though the court finds that Mr. Jiggetts used heroin at some point before his arrest on November 29, thereby lending to the arresting officer's observations at the scene, the court views any claim of later heroin use as far-fetched and hedging.

Although the precise dosage and purity of heroin remain unknown, on average it would be extraordinary to expect the potent effects of heroin to persist for over 19 hours, even in a series of small uses from fingernail amounts and in combination with earlier marijuana use. The most intense peaks of euphoria would last roughly two hours, and one might feel drowsy for several hours or have cloudy mental function, but the potent effects of heroin often would subside in three to five hours. *See* Ctr. for Addiction & Mental Health (Univ. of Toronto), *Heroin* (visited April 20, 2023); Rania Habal, MD, *et al.*, *Heroin Toxicity: Pathophysiology,* Medscape (Feb. 1, 2023); Nat'l Inst. on Drug Abuse, *Heroin Research*

---

[4] Publications available at https://www.health.harvard.edu/heart-health/marijuana-and-heart-health-what-you-need-to-know, and https://nida.nih.gov/publications/drugfacts/cannabis-marijuana, and https://www.cdc.gov/marijuana/health-effects/brain-health.html.

*Report: What are the Immediate (Short-term) Effects of Heroin Use?* (June 2018).[5] Daily users of heroin often need another hit six to twelve hours to avoid symptoms of withdrawal, *see supra*; but Mr. Jiggetts claimed to have been a first-time user and thus someone who would not be experiencing the same effects as a hardened user of this drug or the same potent effects of withdrawal. And at least 19 hours had passed.

Notably, Mr. Jiggetts never mentioned the alleged effects of any drugs, or lack of sleep, to the interviewing officers until an hour and forty-five minutes into the interrogation [1:49:30-1:53:55] and only after the task force officer mentioned that federal prosecutors might get involved. Only then he claimed to have had no sleep, to be coming down from a high, and to not be in the right state of mind. On this record, this was strategic commentary by Mr. Jiggetts, not legitimately reflective of his condition at the time. Even so, there has been no cogent showing, particularly given his engagement and lucidity as displayed on video, that any condition made him more susceptible to any coercive method. Based on the totality of the circumstances, the court finds that Mr. Jiggetts' waiver of his rights was knowing and voluntary. The court thus denies the motion to suppress.

## CONCLUSION

Accordingly, because Mr. Jiggetts never unambiguously requested counsel before or during this interrogation and because law enforcement secured a knowing and voluntary waiver of rights under the Fifth Amendment, the court denies the motion to suppress [ECF 19].

SO ORDERED.

April 21, 2023                                                     *s/ Damon R. Leichty*
                                                                   Judge, United States District Court

---

[5] Publications available at https://www.camh.ca/en/health-info/mental-illness-and-addiction-index/heroin, and https://nida.nih.gov/publications/research-reports/heroin/what-are-immediate-short-term-effects-heroin-use, and https://emedicine.medscape.com/article/166464-overview#a5.